IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 10-1177-TUC-JMR (GEE) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| John Paul Fisher and Jose Palma-Higuera | ) | |
| Defendants. | ) | |
| | ) | |

The District Court referred this case to the Magistrate Judge for hearing on the defendants' (1) motion to suppress evidence resulting from an unlawful search and seizure and (2) motion to dismiss for destroying exculpatory evidence. A hearing on the motions was held on October 25th, 26th, and 29th of 2010.

**Charge:**

The defendants are charged with (1) conspiracy to possess with intent to distribute marijuana and (2) possession with intent to distribute marijuana in violation of Title 21, United States Code §§841(a)(1), 841(b)(1)(B)(vii), and 846.

**Motion to Suppress:**

The defendants argue their vehicle was stopped without reasonable suspicion violating their Fourth Amendment rights. They move that this court suppress all evidence seized as a result of the traffic stop. The court concludes the stop was supported by reasonable suspicion.

1    **EVIDENCE:**

2    ***Garrett Thompson***

3        Garrett Thompson has been agent with U.S. Border Patrol for four years.  On April

4    26, 2010, he was assigned to the Casa Grande AOR (area of responsibility).  At

5    approximately 6:30 a.m., Thompson was traveling in a northwesterly direction on highway

6    86 at mile marker 103 (approximately 20 miles west of Sells) when he passed a gold SUV

7    traveling in the opposite direction.  Because the sun was at his back, he could see the interior

8    of the SUV through the windshield.  The SUV was carrying a number of large block-shaped

9    objects which blocked his view of the SUV's rear window.  The driver was male with a flat

10   brimmed hat and a goatee.  He may have been wearing a gold chain.  His passenger was male

11   with short hair and a moustache.  As he passed the vehicle, Thompson looked in his rear view

12   mirror and noticed the SUV had temporary tags.

13       Based on his training and experience, Thompson knew that highway 86 was

14   frequently used by drug and alien smugglers.  He knew smuggling activity often took place

15   at that time of the morning because it is shift-change time.  He also knew that smugglers

16   often use temporary tags because they can be obtained online avoiding the need to appear in

17   person at the department of motor vehicles and produce identification.  Thompson was also

18   suspicious because he remembered seeing this vehicle approximately one month before in

19   this same area.  He was acquainted with the vehicles in the area and believed this SUV was

20   not a local vehicle.

21       Thompson turned his vehicle around and began to follow the SUV.  The SUV passed

22   a van, pulled in front of the van, and then slowed down.  Based on his experience, Thompson

23   concluded the SUV was trying to keep him from reading the temporary tag.  Thompson

24   pulled alongside the van and indicated to the driver with his lights that he wanted to get

25   directly behind the SUV.  The van allowed him to do so.

26       Unfortunately, Thompson was unable to see the license number clearly because it was

27   covered by a plastic cover which was not completely flat.  He noted that the back window

28   was obscured by some large objects.  Thompson then pulled into the adjacent lane which

- 2 -

allowed him to see the temporary tag clearly from an angle.  As he overtook the SUV, he saw inside large backpacks with shoulder straps.  He recognized these backpacks as the type that typically carry marijuana.  When the driver of the SUV saw Thompson, he tensed up and clenched his fists.  Thompson was able to see the driver and two passengers.[1]  He did not recognize them as members of the local Tohono O'odham tribe.

Thompson discovered the vehicle was registered to an address in Tucson.  He pulled over to allow the SUV to pass.  He called for assistance and then conducted a traffic stop of the SUV. The SUV stopped after approximately one mile.  Thompson found in the SUV 332 pounds of marijuana packed in bundles covered with sugar sack material.

Sugar sack is a tightly woven material that does not shed fibers on the clothing of the person carrying the bundle.  The defendant, Palma-Higuera, did not have the red rub marks on his shoulders that are typically seen on drug mules.  Fibers were not visible on his clothing.

Thomson conceded his report memorializing the stop contained omissions.  He did not mention that he had seen the gold SUV previously.  He did not state that the stop occurred during shift-change.  He did not state that he used his rear flashers to signal to the van that he wanted to pull in behind the SUV. He did not state that, when he passed the SUV the first time, he could see the driver was wearing a hat and had a goatee.

### *Sergio Murueta:*

Murueta is an investigator employed by the Federal Public Defender's office.  He attempted to examine the SUV but found it had been effectively demolished.  He was therefore unable to measure the amount of tint in the side windows.  He did determine that the vehicle had factory tint rather than aftermarket tint.  The only window with intact glass

---

[1] The front-seat passenger was not indicted along with the defendants, John Paul Fisher and Jose Palma-Higuera.

was on the driver-side rear cargo section.  Murueta was unable to view the interior of the vehicle through this window.

Murueta drove to highway 86 to attempt to recreate the conditions surrounding the stop.  Murueta passed several high-profile vehicles and attempted to look inside them.  He could make out the shape of the seats and on one occasion was able to see the driver's shirt sleeve.  He could not see details of the interior of the vehicles.

Murueta attempted to view the license plates of cars that he passed, but he was able to see only a square that he knew must be the license plate.  He was unable to make out any details.

Murueta found that the SUV was a Ford Expedition with privacy glass on the windows behind the first row of seating.  Ford privacy glass allows 23 percent of the light to pass through.

On cross-examination, Murueta conceded he was unable to align the SUV in a way that recreated the angle of light as it existed on 6:30 a.m. on April 26th.  He further conceded that he performed his investigation in September when the angle of the sun was somewhat different than it was be on April 26th.

### *Alejandro Vazquez:*

Vazquez is a licensed investigator with experience in state and federal law enforcement.  On August 20th, he conducted an investigation of the area of the stop.  Vazquez attempted to look into vehicles traveling eastbound toward him.  He could tell if the driver was male or female but was unable to see any further details.  He could not tell if the driver was wearing a necklace or chain.  He thought he might be able to see thick facial hair such as a beard or a big, broad hat such as a cowboy hat.  By using the side view mirror, he was unable to determine anything about the licence plate of the passing cars.

Vazquez conceded on cross-examination that he did not recreate the lighting conditions the existed on April 26th at 6:30 a.m.

1   **DISCUSSION: Motion to Suppress**

2       The defendants argue their vehicle was improperly stopped in violation of their Fourth

3   Amendment rights.  The court concludes there was reasonable suspicion to justify the  stop.

4       An investigative traffic stop must be justified by reasonable suspicion.  *U. S. v.*

5   *Miguel*, 368 F.3d 1150, 1153 (9th Cir. 2004).  "Reasonable suspicion is formed by specific,

6   articulable facts which, together with objective and reasonable inferences, form the basis for

7   suspecting that the particular person detained is engaged in criminal activity."  *Id.*  The court

8   "must look at the totality of the circumstances of each case to see whether the detaining

9   officer has a particularized and objective basis for suspecting legal wrongdoing."  *U. S. v.*

10  *Arvizu*, 534 U.S. 266, 273 (2002) (internal punctuation removed).  The court may consider,

11  *inter alia,* "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of

12  traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the

13  drive[r] including obvious attempts to evade officers; (6) appearance or behavior of the

14  passengers; (7) model and appearance of the vehicle; and (8) officer experience."  *U. S. v.*

15  *Tiong,* 224 F.3d 1136, 1139 (9th Cir. 2000).  "If the initial stop was unconstitutional, then all

16  evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree."

17  *U. S. v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001).

18      In this case, the agent observed a vehicle with temporary plates traveling at shift-

19  change time on a highway frequented by drug and alien smugglers.  The vehicle passed a van

20  and then slowed down in a manner often used by smugglers to prevent law enforcement from

21  viewing the licence plate.  The driver of the vehicle clenched his fists in a startled manner

22  when he saw the Border Patrol officer.  Finally, the vehicle was loaded with square bundles

23  that appeared to be marijuana backpacks.

24      The court finds Thompson to be a credible witness based on the content of his

25  testimony and his demeanor at the hearing.  Based on the totality of the circumstances, the

26  agent had reasonable suspicion to suspect wrongdoing.  The SUV was traveling in an area

27  notorious for smuggling activity at a time when smugglers are most active.  The vehicle was

28  not registered locally and was driven in an evasive way typical of smugglers.  The driver

1    appeared excessively startled when he saw the Border Patrol agent.  Last, but by no means

2    least, the agent saw in the vehicle square shaped bundles with straps that looked like

3    marijuana backpacks.  These facts combined with the training and experience of the agent

4    combine to form a  "particularized and objective basis" for the stop.  *See, e.g., Arvizu*, 534

5    U.S. at 277 (Investigative traffic stop was justified where the driver assumed a rigid posture,

6    the passengers behaved oddly, and the vehicle was traveling at shift-change time with excess

7    cargo through an area frequented by smugglers.).  Accordingly, the traffic stop did not violate

8    the defendants' Fourth Amendment rights, and their motion to suppress should be denied.

9         The defendants introduced evidence that questions the agent's testimony as to what

10   he could see when the SUV passed him traveling in the opposite direction.  The agent

11   testified that he could see details about the people in the SUV and he could see the SUV had

12   temporary plates as it passed by.  The defendants' investigators testified that they were

13   unable to recreate that level of observation.

14        The investigators also introduced evidence designed to cast doubt on the agent's

15   testimony that he could see square bundles in the SUV when he was traveling next to that

16   vehicle in the adjacent lane.  The investigators introduced evidence that the SUV had tinted

17   glass that prevented them from viewing the interior of the SUV.

18        The court finds the investigators' testimony to be of limited value.  The investigators

19   did not perform their tests under the same lighting conditions that existed at the time and date

20   of the stop.  Accordingly, the fact that they could not see details inside the SUV does not

21   necessarily mean the agent was similarly unsighted.  Furthermore, it is not important whether

22   or not the agent could see the SUV's temporary plates during his initial contact.  The agent

23   turned his vehicle around and approached the SUV closely from behind.  At that point, he

24   had ample opportunity to see that the vehicle had temporary plates.

25        The agent conceded that his report contained omissions.  He did not say that the stop

26   occurred at shift-change time or that he saw the SUV once before.  The court finds these

27   omissions to be relatively minor.  Accordingly, they do not cause the court to doubt the

28   agent's veracity.

**Motion to Dismiss:**

The defendants argue the case should be dismissed because the government destroyed exculpatory evidence: the clothing Palma-Higuera wore when he was arrested, their vehicle, and the marijuana and its wrappings.  The court concludes the motion should be denied because the evidence was not destroyed in bad faith.

**EVIDENCE:**

*Frank Armijo, III:*

Armijo has been an agent with U.S. Border Patrol for 14 years.  He authenticated a DEA form which was signed by the defendant, Palma-Higuera, shortly after his arrest.  The form is used for personal belongings with "little or no value."  On the form, Palma-Higuera authorizes the government to immediately destroy those possessions.

Armijo testified that when marijuana is seized, a representative sample is sent for analysis and the remainder is ordinarily destroyed within 60 days.   In this case, the marijuana was destroyed on July 22, 2010.  If the AUSA asks for the marijuana to be retained, it will not be destroyed.  The AUSA did not make that request in this case.

The SUV was seized at the time of the stop.  The Forfeiture Division attempted to notify the registered owner by letter and by publication.  (Government's Exhibit 14.)  These attempts were unsuccessful, and eventually the vehicle was forfeited.  It was later turned over to the Green Valley Fire Department to be used for training.  If the AUSA asks for a vehicle to be retained, it will be, at least for a time.  The AUSA did not make that request in this case.  Armijo obtained pictures of the SUV which indicated that it had been partially demolished.  Notably, almost all the glass windows had been shattered.

The personal property sheet for the defendant, Fisher, does not contain any reference to a gold chain.  (Government's Exhibit 20.)

*Proffer:*

The parties proffered the following information concerning the discovery process:

1    On April 30, 2010, counsel for Fisher sent the government a letter asking that all

2  evidence, including the marijuana and vehicle, be preserved. (Doc. 45.)

3    The SUV was forfeited on June 25, 2010, in accordance with Border Patrol guidelines.

4  (Doc. 50.)  It was donated to the Green Valley Fire Department for use in training exercises

5  when efforts to reach the registered owner failed. (Government's Exhibit 14.)  Border Patrol,

6  unlike U.S. Immigration and Customs Enforcement (ICE), does not inform the prosecutor

7  when a vehicle is about to be destroyed.  (Doc. 50.)

8    The marijuana and its wrappings were destroyed on July 22, 2010, in accordance with

9  standard departmental procedures and 21 U.S.C. §881(f)(2) and 28 C.F.R. 50.21.  (Doc. 50.)

10  Usually, the AUSA receives a 60-day notice of destruction letter and sends the letter on to

11  defense counsel.  (Transcript, 10/26/2010, p. 189-91.)  There is no official office policy,

12  however.  *Id*.  In this case, the AUSA's office received a 60-day notice letter from DEA, but,

13  for reasons unknown, the letter was not sent to defense counsel.  *Id*.

14    Plea negotiations broke down on July 8, 2010, with the defendant, Fisher.  (Transcript,

15  10/26/2010, p. 195.)  Plea negotiations broke down with the defendant, Palma-Higuera, on

16  July 19, 2010.  *Id*.  At this point, preparations for trial began in earnest, and the defendants

17  sought access to the evidence they assumed was still in the government's possession.  On

18  July 28, 2010, counsel for Palma-Higuera sent a letter to the government requesting all

19  evidence in the case be preserved.  (Doc. 50.)  Unfortunately, by this time, the clothing, the

20  SUV, and the marijuana had been destroyed.

21

22  **DISCUSSION: Motion to Dismiss**

23    The defendants argue their due process rights were violated when the government

24  failed to preserve Palma-Higuera's clothes, the marijuana and packaging material, and the

25  SUV.  They maintain close examination of the clothes would show an absence of sugar sack

26  fibers indicating the wearer did not carry the marijuana backpacks.  They further argue

27  examination of the marijuana packing material for fingerprints would prove the defendants

28  did not handle the marijuana packages.  Finally, the defendants argue preserving the SUV

- 8 -

1  with its tinted windows intact would have allow them to prove that the agent could not have

2  seen the marijuana packages as he claimed.

3        Here, the lost evidence falls into the category of potentially exculpatory material. The

4  exculpatory nature of the evidence was not readily apparent when the evidence was

5  destroyed. If the evidence had not been destroyed, the evidence could have been subject to

6  certain tests that might have yielded information useful to the defense. Thus, the material

7  was only potentially exculpatory. *Illinois v. Fisher*, 540 U.S. 544, 547-48, 124 S.Ct. 1200,

8  1202 (2004). The destruction of potentially exculpatory material violates due process only

9  if the government acted in bad faith. *Id*. at 549, 1203. Bad faith ordinarily turns on the

10  government's knowledge of the evidence's exculpatory value at the time it was lost or

11  destroyed. *U. S. v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

12        There is no evidence of bad faith here. Accordingly, the motion should be denied.

13

14  **The Clothing**

15        Palma-Higuera's clothing was apparently destroyed shortly after he signed a statement

16  authorizing its immediate destruction on April 27, 2010. (Government's Exhibit 13.) The

17  statement is in English, but in accordance with standard procedures, a Spanish speaking agent

18  should have been on hand to explain the form to him at the time it was signed. There is no

19  evidence that standard procedures were not followed in this case. The clothing was

20  destroyed in accordance with standard operating procedures. There is no evidence of bad

21  faith. *U. S. v. Belden*, 957 F.2d 671, 673-73 (9th Cir.) (Bad faith was not shown where

22  evidence was destroyed in accordance with routine practice.), cert. denied, 506 U.S. 882

23  (1992).

24        Palma-Higuera's clothing was at most potentially exculpatory. The clothing was not

25  destroyed in bad faith. Accordingly, the defendants' motion to dismiss should be denied.

26

27  **The SUV and the Marijuana**

28

The defendants maintain the SUV and the marijuana were destroyed in bad faith. They argue bad faith could be inferred from the fact that the evidence was destroyed after counsel for Fisher sent his letter requesting all evidence be preserved.  This letter, however, is considered by all parties to be somewhat *pro forma*.  (Government's response, p. 2.)  The government does not have the resources to preserve all evidence from all cases. Accordingly, the parties generally delay taking action to preserve evidence until plea negotiations break down or the agencies send notification that destruction is imminent.

In this case, the evidence was destroyed before negotiations broke down, and, unfortunately, the parties' reliance on further notification proved to be in vain.  The AUSA's office did receive a 60-day letter indicating the marijuana was about to be destroyed.  For reasons unknown, however, this message was not relayed to defense counsel.  It usually is, but there is no set policy in the office, and in this case it was not done.  Accordingly, the defendants received no further notification and did not inform the AUSA that they wished the evidence to be preserved.  The AUSA therefore did not ask the DEA to preserve the evidence.  The marijuana was subsequently destroyed in accordance with standard DEA policy.  At most, the AUSA's office was negligent.  There is no evidence of bad faith.  *See Illinois v. Fisher*,  540 U.S. 544, 548, 124 S.Ct. 1200, 1202 (2004) (Bad faith may not be inferred simply because evidence was destroyed contrary to defendant's discovery request.); *United States v. Belden*, 957 F.2d 671, 673-73 (9th Cir.)  (Bad faith was not shown where evidence was destroyed in accordance with routine practice designed to accommodate limited storage capacity.), cert. denied, 506 U.S. 882, 113 S.Ct. 234 (1992); *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337 (1988) (Negligence does not constitute bad faith.); *U.S. v. Bohl*, 25 F.3d 904, 912 (10th Cir. 1994)  (same, collecting cases).

Similarly, there was no further notice that the destruction of the SUV was imminent. Apparently, the AUSA believed he would receive notice that destruction was imminent and could in turn relay that urgency to defense counsel.  Unfortunately, while the ICE agency gives this type of notice, the Border Patrol does not.  In accordance with agency standard policy,  the SUV was destroyed without further notice to the parties.  At best, the AUSA's

expectation of further notice was negligence.  There is no evidence of bad faith.  *See citations above.*

The SUV and the marijuana were, at most, potentially exculpatory.  They were not destroyed in bad faith.  Accordingly, the defendants' motion to dismiss should be denied.

**RECOMMENDATION:**

In view of the foregoing it is recommended that, after its independent review of the record, the District Court **DENY** the motion to suppress (Docs. 37 and 40) and **DENY** the motion to dismiss (Doc. 45).  This Report and Recommendation is being faxed to all counsel on this date.  Each counsel may serve and file written objections within 14 days.  If objections are not timely filed, the party's right to de novo review may be waived.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 23rd day of November, 2010.

Glenda E. Edmonds
United States Magistrate Judge